Ralph M. Stone (rstone@lawssb.com)
Thomas G. Ciarlone (tciarlone@lawssb.com)
Amanda C. Scuder (ascuder@lawssb.com)
SHALOV STONE BONNER & ROCCO LLP
485 Seventh Avenue, Suite 1000
New York, New York 10018
(212) 239-4340

*Attorneys for Plaintiff*



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARY GIDARO, individually and on behalf of all others similarly situated, | : |
| | : |
| Plaintiff, | : Case No. 07 CV 10273 |
| | : |
| v. | : |
| | : |
| MERRILL LYNCH & CO., INC.; STAN O'NEAL; LOU DIMARIA; INVESTMENT COMMITTEE OF THE MERRILL LYNCH SAVINGS AND INVESTMENT PLAN; ADMINISTRATIVE COMMITTEE OF THE MERRILL LYNCH SAVINGS AND INVESTMENT PLAN; and JOHN DOES 1-30, | : **CLASS ACTION** |
| | : |
| | : **COMPLAINT** |
| | : |
| | : |
| Defendants. | : |

Plaintiff Mary Gidaro ("Plaintiff"), on behalf of the Merrill Lynch & Co., Inc. 401(k) Saving and Investment Plan (the "SIP"), the Retirement Accumulation Plan (the "RAP") and the Employee Stock Ownership Plan (the "ESOP") (the three plans treated under a single umbrella by Merrill Lynch and referred to collectively herein as the "Plan") and on behalf of a class of similarly situated participants and beneficiaries of the Plan (the "Participants"), by her attorneys, alleges the following for her Complaint ("Complaint"):

## I. Nature of the Action and Summary of Claims

1.      Plaintiff, a participant in the Plan, brings this action against Merrill Lynch & Co, Inc. ("Merrill Lynch" or the "Company") and others for Plan-wide relief on behalf of the Plan, and all Participants in the Plan for whose individual accounts the Plan held an interest in the common stock of Merrill Lynch ("Company Stock") between January 18, 2007 and November 7, 2007 (the "Class Period").  Plaintiff brings this action on behalf of the Plan and its Participants pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2)and (3), to recoup Plan losses incurred by the Defendant fiduciaries breaches of duty arising out of the offering of, and investment of Plan assets in, imprudent Company Stock.

## II. Jurisdiction and Venue

2.      **Subject Matter Jurisdiction.**  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA 502(e)(1), 29 U.S.C. § 1132(e)(1).  In addition, this Court has subject matter jurisdiction pursuant 28 U.S.C. § 1331.

3.      **Personal Jurisdiction.**  ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are residents of the United States.  Accordingly, this Court has personal jurisdiction over them.

4.      **Venue.**  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and one or more of the Defendants

reside or maintain a place of business in this district.  Venue is also proper in this District under 28 U.S.C. § 1391(b) & (c) because some of the Defendants, including the Company itself, reside, have principal executive offices, and/or systematically and continuously do business in this District.

## III. The Parties

### Plaintiff

5.      Plaintiff Mary Gidaro is an employee of Merrill Lynch and is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  The Plan held units of Company stock in Plaintiff's individual account.

### Defendants

6.      Defendant Merrill Lynch & Co., Inc., ("Merrill Lynch" or the "Company"), is a Delaware corporation with its principal place of business located at 4 World Financial Center, New York, N.Y. 10080.  According to the Plan's annual reports on Form 5500, Merrill Lynch is the Plan's sponsor and administrator.

7.      Defendant Stan O'Neal ("O'Neal"), was at all relevant times until October 30, 2007, the Chief Executive Officer of Merrill Lynch.

8.      Defendant Investment Committee of the SIP, according to the Plan's annual report for the year ended 2006 on Form 11-K, dated June 26, 2007 (the "2006 11-K"), consists of a group of senior Company executives, excluding any directors or executive officers.  According to the 2006 11-K, the Investment Committee "has the authority to designate investment funds for the investment of accounts and to establish rules and procedures with respect to investment funds."

9.      Defendant Administrative Committee of the SIP is, according to the 2006 11-K the entity that administers the Plan. The Administrative Committee is also the signatory to the 2006 11-K. The Investment Committee and the Administrative Committee, as well as their John Doe members, are collectively referred to herein as the Committee Defendants.

10.     Defendant Louis DiMaria ("DiMaria") is Chairman of the Administrative Committee and the signatory to the 2006 11-K.

11.     Defendant John Does 1-10 are Plan fiduciaries, members of the Committee Defendants, and/or persons who exercised discretionary authority over the Plan and/or the Company Fund. After Plaintiff has had a reasonable opportunity to conduct discovery and at such time as the identities of the John Doe Defendants are revealed, Plaintiff may seek leave to amend.

## IV. The Plan

12.     The Merrill Lynch & Co., Inc. 401(k) Saving and Investment Plan (the "SIP"), the Retirement Accumulation Plan (the "RAP") and the Employee Stock Ownership Plan (the "ESOP") (collectively, the "Plan") is an employee benefit Plan within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. § 1002(3) and 1002(2)(A). The Plan covers all eligible employees of Merrill Lynch and certain subsidiaries.

13.     The Plan is a "defined contribution" or "individual account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's account. Consequently, retirement

benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

14.    Participants make annual contributions to the Plan on a pre-tax basis ("Voluntary Contributions").

15.    Prior to January 1, 2007, the Company matched one-half of the first 6% of eligible compensation that Participants contribute, up to an annual maximum Company contribution of $2,000, after one year of service ("Matching Contributions").  Effective January 1, 2007, the Matching Contributions were changed such that the Company matches 100% of the first 4% of each Participant's eligible compensation contributed to the Plan, up to a maximum of $3,000 annually for Participants with eligible compensation of less than $300,000, after one year of service.  For Participants with eligible compensation equal to or greater than $300,000 the maximum annual Company contribution remains $2,000.

16.    Participants are always 100% vested in their Voluntary Contributions. Participants become vested in Matching Contributions and earnings thereon based on completed Years of Service: 1 Year of Service – 20% vested; 2 Years of Service – 40% vested; 3 Years of Service – 60% vested; 4 Years of Service – 80% vested; and 5 Years of Service – 100% vested. Participants become 100% vested in Matching Contributions when they attain age 65 or terminate employment as a result of death. According to the 2006 11-K: "Participants are 100% vested in the dividends paid on Company common stock held in their notional account regardless of their years of service."

17.    At all relevant times, the common stock of Merrill Lynch ("Company Stock") was an investment option for Participants.  At December 21, 2006 and 2005, the value of the Plan's holdings in Company Stock was $1,528,308,452 and $1,244,693,323, respectively.

18.    At December 31, 2006 and 2005, the Plan held 16,415,773 and 18,377,282 units, respectively, of common stock of Merrill Lynch with a cost basis of $673,482,462 and $707,391,683, respectively.    During the year ended December 31, 2006, the Plan recorded dividend income of $17,690,997 for the common stock of Merrill Lynch.

## V. <u>Defendants Are Fiduciaries of the Plan</u>

19.    At all relevant times, Defendants were fiduciaries of the Plan because:

(a)    they were so named; and/or

(b)    they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)    they exercised discretionary authority or discretionary control respecting management the Plan; and/or

(d)    they had discretionary authority or discretionary responsibility in the administration of the Plan. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  In that regard, a person is a fiduciary even if a plan does not name him as such or by its terms assign fiduciary duties to him where by his conduct he engages in fiduciary activities.  The test for whether a person (or entity) is a fiduciary is functional and based on actual conduct.  Those who have control over management of a plan or plan assets are fiduciaries regardless of the labels or duties assigned to them by the language of a plan.  Moreover, in order to fulfill the express remedial purpose of ERISA, the definition of "fiduciary" is to be construed broadly.

-6-

20.    A fiduciary may not avoid his fiduciary responsibilities under ERISA by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified within limits by the plan sponsor, the fiduciary may not follow the plan document if to do so leads to an imprudent result under ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

21.    Merrill Lynch is a fiduciary of the Plan because it is described by Plan documents as the Plan's administrator.

22.    The Investment Committee is a fiduciary of the Plan because it is identified by the Plan's annual report with the "the authority to designate investment funds" for the Plan.

23.    The Administrative Committee is a fiduciary of the Plan because it is the signatory of, and identified by the 2006 11-K as the Plan's administrator.

24.    DiMaria is a fiduciary of the Plan because he is the Chairman of the Administrative Committee.

25.    John Does 1-30 are additional persons or entities who had fiduciary authority for the Plan either as named fiduciaries or because they were *de facto* fiduciaries under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

26.    Plaintiffs' claims arise from the failure of the Defendants to act solely in the interest of the participants and beneficiaries of the Plan and to exercise the required care, skill, prudence, and diligence in administering the Plan and investing its assets.  The Defendants violated their fiduciary obligations to the Plan under ERISA §§ 404 and 405, 29 U.S.C. §§ 1104 and 1105 by, among other things:

    (a)    failing to prudently manage the assets of the Plan by allowing Company stock to be an investment option for the Plan and by maintaining investment in shares of Company stock for the Plan under circumstances

in which Defendants could not reasonably have believed that continued investment in Company stock was prudent;

(b)    failing to properly monitor the Plan's fiduciaries to ensure that they were prudently and loyally serving the interests of the Plan's participants and, in connection therewith, failing to remove and replace fiduciaries whom they knew or should have known were acting disloyally and imprudently with respect to the Plan and its assets;

(c)    failing to provide complete and accurate information to the Plan' participants and beneficiaries and to refrain from providing false information or concealing material information regarding the Plan' investment options such that participants can make informed decisions with regard to investment options available under the Plan; and

(d)    failing to avoid conflicts of interests and to resolve them promptly when they occur by continuing to allow Company stock as an investment for the Plan during the Class Period, by failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plan's investment in Company stock and by failing to notify the Department of Labor about the information which made employer stock an unsuitable investment for the Plan.

27.    Defendants' breaches of fiduciary duty with respect to the Plan's offering, holding and acquisition of Company stock resulted in losses to the Plan which the Defendants are personally liable to make good to the Plan pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).

28.    Because Plaintiff's claims apply to the Plan's participants and beneficiaries as a whole, and because ERISA authorizes plan participants such as Plaintiff to sue for plan-wide relief for breaches of fiduciary duty, Plaintiff brings this action on behalf of herself and all participants and beneficiaries of the Plan during the Class Period.

## VI. Fiduciary Duties under ERISA

29.    **The Statutory Requirements.**  ERISA imposes strict fiduciary duties upon plan

fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and . . . for the
> exclusive purpose of providing benefit to participants and their
> beneficiaries; and defraying reasonable expenses of administering
> the plan; with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a like
> capacity and familiar with such matters would use in the conduct
> of an enterprise of like character and with like aims; by
> diversifying the investments of the plan so as to minimize the risk
> of large losses, unless under the circumstances it is clearly prudent
> not to do so; and in accordance with the documents and
> instruments governing the plan insofar as such documents and
> instruments are consistent with the provisions of this title and Title
> IV.

30.    **The Duty of Loyalty.**  ERISA imposes on a plan fiduciary the duty of loyalty--

that is, the duty to "discharge his duties with respect to a plan solely in the interest of the

participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to

participants and their beneficiaries . . . ."

31.    The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them

promptly when they occur.   A fiduciary must always administer a plan with an "eye single" to

the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries

themselves or the plan sponsor.

32.    **The Duty of Prudence.**  Section 404(a)(1)(B) also imposes on a plan fiduciary

the duty of prudence--that is, the duty "to discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence

under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

33.    **The Duty to Inform.**    The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: 1) a negative duty not to misinform; 2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and, 3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

34.    Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires that fiduciaries furnish a Summary Plan Description ("SPD") to Participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD must apprise Participants of their rights under the Plan. The SPD and all information contained or incorporated therein constitutes a representation in a fiduciary capacity upon which Participants are entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a

> manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).

35.     **The Duty to Investigate and Monitor Investment Alternatives.**  With respect to a pension plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable option for the Plan.

36.     **The Duty to Monitor Appointed Fiduciaries.**   Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed.  The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.  In a 401(k) plan such as the Plan, the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

a.     possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

b.     are knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan's participants;

c.     are provided with adequate financial resources to do their jobs;

      d.     have adequate information to do their jobs of overseeing the plan investments with respect to company stock;

      e.     have access to outside, impartial advisors when needed;

      f.     maintain adequate records of the information on which they base their decisions and analysis with respect to plan investment options; and,

      g.     report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

37.     **The Duty Sometimes to Disregard Plan Documents**.  A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

38.     **Co-Fiduciary Liability**.  A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances.  ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>      (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
>      (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

39.    **Non-Fiduciary Liability**.    Non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## VII. <u>Defendants' Communications with the Plan's Participants</u>

40.    Defendants regularly communicated with employees, including the Plan's Participants, about the Company's corporate performance, future financial and business prospects, and the attractiveness of the Company's stock. During the Class Period, the Company fostered a positive attitude toward investing in the Company.    Management touted strong Company performance.    Employees continually heard positive news about the Company's growth, were led to believe that the Company stock was a good investment, and that the Plan was prudently managed.

41.    Company leaders uniformly portrayed the positive performance of the Company and its stock, encouraging employees to share in the wealth.    For example, at annual and quarterly meetings during the Class Period, Company leaders sold employees on the health and future of the Company and encouraged them to invest in Company stock.

42.    Employees received widely-circulated emails encouraging them to invest in Company stock through the Plan.    Employees could also access their accounts and receive information about the Plan on the Internet.

43. Moreover, the Company repeatedly highlighted favorable operating results, artificially favorable revenue growth trends, and other positive financial indicators, which were later found to be materially incorrect and overstated during the Class Period.

44. Plan documents detailed investment advice, but failed to warn Participants of the risks in investing in Company stock, particularly as a retirement investment.

45. Plan documents warned Participants to seek advice before withdrawing funds from the Plan but offered no such warning relating to investments in Company stock.

46. Plan documents advised that Participants should seek advice concerning tax implications, but no such advice to get independent professional advice concerning the prudence of investing in the Company stock.

47. The Plan documents incorporated by reference SEC documents, which were later found to be misleading.

48. As fiduciaries, the Defendants had a duty to provide Participants with complete and accurate information regarding the Plan's investment options, including the Company's stock.

49. Despite these duties, however, the Defendants failed to provide the Plan's Participants with complete and accurate information regarding the Company's stock, such that the Participants could appreciate the true risks presented by investments in Company stock and could make informed decisions regarding investments in the Company stock in the Plan.

50. Participants never received information regarding the risks of Company stock, regarding the risks associated with the Plan's large holding of Company stock, or regarding the imprudence of Company stock as a retirement investment choice.

-14-

51.    Defendants encouraged Participants to invest in Company stock and discouraged them to liquidate.

52.    Defendants, as professional plan managers, knew or should have known certain basic facts about the characteristics and behavior of the Plan's Participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

    a.    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

    b.    Out of loyalty, employees tend to invest in company stock;

    c.    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

    d.    Employees tend not to change their investment option allocations in the plan once made;

    e.    No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

    f.    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and,

    g.    Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

53.    Even though Defendants knew or should have known these facts, and even though the Defendants knew of the high concentration of the Plan's funds in Company stock, they did nothing to address the problem.

-15-

## VIII.  <u>Factual Background of Breaches of Fiduciary Duty</u>

54.     In October and November 2007, Merrill Lynch revealed that its exposure to subprime loans, and actual losses already incurred and associated with those loans, was far greater than previously disclosed. Merrill Lynch's manipulation of its financial reporting, allegations of other misconduct by Merrill Lynch concerning efforts to conceal its losses,  and potential accounting irregularities are being investigated by the Securities and Exchange Commission ("SEC").   The price of Merrill Lynch stock has declined precipitously upon disclosure of these matters.

55.     Prior to the Class Period, Merrill invested heavily into the CDO market, in significant part because of the lucrative fees Merrill Lynch enjoyed from underwriting activies assocaited with that market.  As *The Wall Street Journal* reported on October 25, 2007:

> From 2003 to early 2006, Christopher Ricciardi helped transform Merrill from bit player to powerhouse in the lucrative business of bundling loans into salable securities. . . .
>
> . . . . Long before joining Merrill, he helped push Wall Street into risky new areas such as subprime mortgages, those made to home buyers with weak credit. Then he helped turn Merrill into the Wal-Mart of the CDO industry, before leaving behind a roughly $8 million annual paycheck to jump to a small firm that was a Merrill client.
>
>           *     *     *
>
> Merrill, which continued to expand its CDO business aggressively after Mr. Ricciardi left, now is the biggest casualty of the downturn after underwriting many troubled CDO's in the past year. In a conference call with investors yesterday, Merrill CEO Stan O'Neal acknowledged that the firm had fumbled the CDO business: "The bottom line is, we got it wrong by being overexposed to subprime." Mr. O'Neal added that Merrill had misjudged the risk of many

CDO's. "It turned out that both our assessment of the potential risk and mitigation strategies were inadequate," he said.

\*     \*     \*

Long after signs of housing troubles first emerged in mid-2005, [Ricciardi] and his colleagues at Merrill were setting out to smash records by issuing ever more CDO's.

From the manicured lawns at the exclusive Sleepy Hollow Country Club to the ski slopes of Jackson Hole, Wyo., and wood-paneled rooms of Manhattan's Harvard Club, they courted investors with promises of well-managed risk and outsize returns. They helped to build a small army of a new sort of finance professional, people who manage the mountain of complex debt instruments being created.

\*     \*     \*

Corporate junk bonds provide high yields, but investors soured on them in the post-bubble years of 2001 and 2002 when defaults on corporate bonds spiked. With the housing market surging, mortgage securities seemed to many investors like a better bet. Mr. Ricciardi coached salespeople he worked with to stress that mortgage CDO's offered better interest rates than corporate bonds with similar ratings.

\*     \*     \*

By the summer of 2001, Credit Suisse was selling at least one new CDO a month and vaulting up Wall Street's so-called underwriting league tables. In 2001 Credit Suisse underwrote CDO's worth $12.5 billion, nearly double those of No. 2 Deutsche Bank AG, according to Dealogic.

Merrill, by contrast, had a minuscule presence. Its top brass was determined to get bigger in this growing business. Contacted by a headhunter, Mr. Ricciardi jumped to Merrill in 2003.

Merrill was in transition those days. It had a new CEO, Mr. O'Neal, who was trying to turn the firm into a nimble presence that darted in and out of lucrative, fast-growing businesses. His priorities included debt financing and derivatives, or instruments

-17-

whose value depends on a change in some other asset's value. Merrill, Mr. Ricciardi told BondWeek magazine in January 2004, "had a good foundation for a good CDO business." What it needed was a "jump start."

\*　　\*　　\*

Merrill leapt from 15th place among CDO underwriting ranks in 2002, when it arranged just $2.22 billion of deals, to the No. 1 spot on Wall Street in 2004 with $19 billion, according to Dealogic. In 2005 Merrill's underwriting total soared to $35 billion, of which $14 billion were backed mostly by securities tied to subprime mortgages.

\*　　\*　　\*

Merrill salespeople scoured the globe for buyers of CDO's, selling pieces of them to a wide range of investors such as Woori Bank in Seoul, Korea, AXA SA of France, Uniqa Group of Austria and investment funds in Australia and Singapore. Among the buyers was a wireless-broadband company in Dallas called MetroPCS Communications Inc. Last week, in District Court of Dallas County, Texas, MetroPCS sued Merrill over a $134 million investment made this spring in CDO's  that Merrill underwrote between 2003 and 2006, while Mr. Ricciardi was still there.

\*　　\*　　\*

At Merrill, Mr. Ricciardi courted clients at his country club, Sleepy Hollow, where Merrill held an annual August golf outing for money managers and investors, and Merrill's top brass. One regular at the outings was Ralph Cioffi, who managed two Bear Stearns Cos. hedge funds that invested heavily in Merrill Lynch CDO's. In a major casualty of the subprime mortgage turmoil this summer, the two Bear funds ended up losing as much as $1.6 billion of investors' money.

Merrill distributed some of its riskiest CDO slices through its global network of wealthy private clients. One former Merrill executive recalls attending an event at New York's Harvard Club in 2004 at which salesmen described the merits of CDO investing to doctors, hedge-fund managers and businessmen. "They were all

-18-

rich guys. We would explain how CDO's worked, and how much return they could get if losses didn't go above a certain level," says this former executive. A few individuals later agreed to invest.

Within Merrill, Mr. Ricciardi drew attention at the highest levels. His group became an increasingly important profit center for Merrill, which reaped an estimated $400 million in CDO underwriting profits in 2005.

When Mr. Ricciardi left in February of 2006, signs of trouble in the housing market were already abundant, as both home-price appreciation and home builders' orders slowed. Cohen & Co., aiming to go public, offered Mr. Ricciardi an equity stake if he came aboard. He had wanted a bigger job at Merrill that went beyond CDO underwriting. When it didn't come, he jumped to Cohen – taking with him several Merrill bankers, salesmen and a technology expert.

Before he left Merrill, Mr. Ricciardi had budgeted for no growth in 2006 in mortgage CDO's at the firm. But following the departures, Dow Kim, then head of markets and investment banking at Merrill, sought to reassure the CDO group that Merrill remained committed to the business, saying it would do "whatever it takes" to remain No. 1 in CDO's, say three people who heard him.

*That year, Merrill sharply boosted subprime-CDO issuance to $44 billion, from $14 billion in 2005. Its fees from CDO's jumped to more than $700 million. Well into 2007, Merrill continued to ramp up deals.*

\*    \*    \*

At a Sleepy Hollow golf outing about a year ago, Mr. Ricciardi remarked to former Merrill colleagues that Merrill was doing business with too many unknown upstarts, now his competitors, according to a person familiar with the conversation.

This summer's meltdown in subprime mortgages and related securities was swift, hurting Cohen as well as Merrill. Mr. O'Neal yesterday vowed to downsize Merrill's business in structured finance.

56.    It is now clear that prior to the beginning of the Class Period, Merrill's top officers and the fiduciaries of the Plan knew that Merrill had deep exposure problems relating to CDO's in its portfolio.

57.    On January 18, 2007, Merrill reported its financial results for fourth quarter and full year 2006, in a release that stated in part:

> Merrill Lynch today reported record full-year net revenues, net earnings and earnings per diluted share for 2006, driven by strong growth in the firm's business segments. Net earnings for 2006 were $7.5 billion, or $7.59 per diluted share, as total net revenues increased strongly to $34.7 billion.
>
> Pretax earnings increased to a record $10.4 billion, the pretax profit margin rose to a record 30.1 percent, and the return on average common equity increased to 21.3 percent. Book value per common share was $41.37, up 15 percent from 2005. Merrill Lynch's 2006 results included the one-time net gain arising from the closing of the merger between Merrill Lynch Investment Managers (MLIM) and BlackRock during the third quarter, which was essentially offset by the one-time non-cash compensation costs recorded in the first quarter.
>
> These one-time items, in aggregate, increased both full-year net revenues and non-interest expenses by approximately $2.0 billion, resulting in a slightly negative net impact to 2006 net earnings of $72 million, or 9 cents per diluted share. Adjusted to exclude the impact of those one-time items, full-year 2006 net earnings were $7.6 billion, up 48 percent from 2005, and net earnings per diluted share were $7.68, up 49 percent. On the same basis, pretax earnings of $10.4 billion increased 44 percent, as net revenues rose 26 percent to $32.7 billion; the pretax profit margin was 31.9 percent, up 4.1 percentage points; and the return on average common equity was 21.6 percent, up 5.6 percentage points. . . .
>
> "We are extremely pleased with Merrill Lynch's performance for the year and the fourth quarter," said Stan O'Neal, chairman and chief executive officer. "By virtually any measure, our company completed the most successful year in its history. Revenues,

earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we can offer clients, expanding our geographic footprint, diversifying our business mix, managing and deploying our capital more effectively, and investing in top talent. We finished the year positioned better than ever to capitalize on the array of opportunities still emerging around the world as a result of what we believe are fundamental and long-term changes in how the global economy and capital markets are developing."

Fourth-quarter 2006 net earnings were $2.3 billion, and net earnings per diluted share were $2.41, up 71 percent from the year-ago quarter but down 24 percent from the third quarter of 2006, which included the one-time net gain from closing the BlackRock transaction. Similarly, pretax earnings of $3.4 billion were up 65 percent from the year-ago period but down 19 percent from the third quarter, as net revenues of $8.6 billion were up 27 percent from the year-ago quarter and down 13 percent sequentially. The fourth-quarter pretax profit margin was 39.0 percent, and the annualized return on common equity was 25.6 percent.

Excluding the one-time merger-related net benefits in the third quarter of 2006 from the sequential comparisons, Merrill Lynch's fourth-quarter 2006 net earnings and diluted earnings per share were both 21 percent higher than the third quarter; pretax earnings were 42 percent higher; net revenues were 8 percent higher; and all those fourth-quarter results would have set quarterly records.

58.    On February 26, 2007, Merrill filed its Form 10-K for fiscal 2006, which included results for the fourth quarter and full year 2006, and included the same financial results as previously reported. The Form 10-K stated in part:

During 2006, our GMI business generated record-setting financial performance by continuing to serve clients well, take measured principal risk and execute on a variety of key growth initiatives around the world. Every major GMI business produced revenue growth over 2005 against a market backdrop that was favorable for most of the year. Across all businesses, GMI had a net increase of more than 200 managing directors and directors and 280 vice presidents to its headcount.

In FICC, we continued to broaden the scope of the commodities trading business in terms of product, geography, and linkage to the broader client franchise, including trading in oil and metals and geographically in the Pacific Rim. We also enhanced our structured finance business with three strategic transactions in the U.S., United Kingdom and South Korea that we expect to provide additional sources of origination and servicing for our non-prime mortgage-backed securitization and trading platform. We also made progress in key investment areas including both interest rate and credit derivatives, principal investing/real estate, and foreign exchange.

Within FICC, on September 5, 2006, we announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform from National City Corporation. We expect First Franklin to accelerate our vertical integration in mortgages, adding scale to our mortgage securitization and trading platform. This acquisition was completed on December 30, 2006, the first day of our 2007 fiscal year.

In Equity Markets, we continued to enhance our leading cash equity trading platform by adding to our portfolio and electronic trading capabilities through additional investments in personnel and technology, as well as additional acquisitions, partnerships and investments. We also made progress in our equity-linked trading business, another key area of investment which increased its revenues more than 50% in 2006. Our equity financing and services business, which includes prime brokerage, set a revenue record in 2006 and continued to gain scale as we further expanded our relationships with hedge funds. The strategic risk group, our distinct proprietary trading business, also generated record revenues, benefitting from continued investments in personnel and infrastructure that provided the capabilities to take more risk when market opportunities arose. We also continued to generate increased revenues and make significant new investments in our private equity business.

59.    On April 19, 2007, Merrill issued its financial results for the first quarter of 2007, in a release which stated in part:

Merrill Lynch today reported strong growth in net earnings and earnings per diluted share for the first quarter of 2007, driven by net revenues of $9.9 billion. Net revenues were up 24 percent from the prior-year period and up 14 percent from the fourth quarter of 2006, with increases both year over year and sequentially in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), and in all global regions. These are the second-highest quarterly net revenues Merrill Lynch has ever generated, only $51 million lower than in the third quarter of 2006, when net revenues included a $2.0 billion one-time, pretax gain arising from the merger of Merrill Lynch Investment Managers (MLIM) with BlackRock, Inc.

First-quarter 2007 net earnings per diluted share were $2.26, up 414 percent from 44 cents for the first quarter of 2006, or 37 percent on an operating basis, which excludes $1.2 billion, after taxes, of one-time compensation expenses from the 2006 first quarter. Net earnings per diluted share were down 6 percent from $2.41 for the fourth quarter of 2006. First-quarter 2007 net earnings were $2.2 billion, up 354 percent from the first quarter of 2006, or up 31 percent excluding the one-time expenses in the prior-year period. Net earnings were down 8 percent from the fourth quarter of 2006, which included a lower compensation expense ratio. The pretax profit margin for the first quarter of 2007 was 31.4 percent, and the annualized return on average common equity was 23.3 percent. At the end of the first quarter, book value per share was $41.95, up 13 percent from the end of the first quarter of 2006 and 1 percent from the end of 2006.

"This was a terrific quarter. In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our shareholders," said Stan O'Neal, chairman and chief executive officer. "Our product capabilities and geographic reach are stronger and broader now than at any point in our history, and we continue to make investments to further enhance our franchise. We remain focused on disciplined growth to capitalize on the positive secular trends we continue to see unfold."

Fixed Income, Currencies and Commodities (FICC) net revenues increased 36 percent to a record $2.8 billion driven by nearly every major revenue category, as revenues from credit products, real estate, interest rate products and currencies grew to record levels.

Revenues from trading commodities also increased significantly. Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination, securitization and trading of non-prime mortgage loans and securities in the U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters.

60.    By the end of April 2007, Merrill's stock was trading above $90 per share.

61.    Attending a conference in London during the last week of June 2007, O'Neal stated that problems in the subprime area were "reasonably well contained." O'Neal added that, "There have been no clear signs it's spilling over into other subsets of the bond market, the fixed-income market and the credit market."

62.    On July 17, 2007, Merrill announced its financial results for the second quarter of 2007, in a release which stated in part:

Merrill Lynch today reported very strong net revenues, net earnings and earnings per diluted share for the second quarter of 2007, which enabled the company to achieve record net revenues, net earnings and net earnings per diluted share for the first half of 2007.

Second-quarter 2007 total net revenues of $9.7 billion increased 19 percent from $8.2 billion in the prior-year period and were down 1 percent from $9.9 billion in the first quarter of 2007. Year-over-year, strong revenue growth in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), as well as across all global regions, drove the increase. These are the highest net revenues Merrill Lynch has ever generated in a fiscal second quarter and the second highest the firm has generated for any quarterly period on an operating basis, excluding from the comparison the $2.0 billion one-time, pretax gain that arose from the merger of Merrill Lynch Investment Managers with BlackRock, Inc. (NYSE: BLK) in the third quarter of 2006.

-24-

Second-quarter 2007 net earnings per diluted share were $2.24, up 37 percent from $1.63 in the second quarter of 2006 and down less than 1 percent from $2.26 for the first quarter of 2007. Net earnings were $2.1 billion, up 31 percent from the second quarter of 2006 and down 1 percent from the first quarter of 2007. The pretax profit margin for the second quarter of 2007 was 31.1 percent, up 2.4 percentage points from the prior-year period, and the annualized return on average common equity was 22.4 percent, up 3.8 points. At the end of the second quarter, book value per share was $43.55, up 17 percent from the end of the second quarter of 2006.

"We delivered another strong quarter in a volatile and, at times, hostile market environment," said Stan O'Neal, chairman and chief executive officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline and global expansion continues to enhance the earnings power of our franchise."

Net revenues for the first six months of 2007 set a record, at $19.6 billion, up 21 percent from $16.1 billion in the first half of 2006. Record net earnings per diluted share of $4.50 were up 117 percent from $2.07 in the prior-year period, while net earnings of $4.3 billion were up 104 percent. Results for the first six months of 2006 included $1.2 billion, after taxes, of one-time compensation expenses incurred in the first quarter of that period. Excluding those expenses, net earnings per diluted share were up 37 percent from the prior-year period, while net earnings were up 31 percent. The first-half pretax profit margin was 31.2 percent, up 13 percentage points from the first half of 2006, or 2.1 percentage points excluding the one-time expenses. The annualized return on average common equity was 22.8 percent, up 10.9 percentage points from the first six months of 2006, or 3.8 points excluding the onetime expenses.

63.    During July 2007, most bank stocks declined due to the credit squeeze. Merrill's stock, while dropping, continued to trade at artificially inflated levels due to the concealment of its own mortgage-related problems.

64.     As other banks announced they would take mortgage-related charges in the third

quarter of 2007, Merrill also announced a $5.5 billion charge for its third quarter 2007, in early

October. O'Neal stated with respect to the charge that, "'Despite solid underlying performances

in most of our businesses in the third quarter, the impact of this difficult market was much more

severe in certain of our FICC [fixed income, currencies and commodities] businesses than we

expected earlier in the quarter.'" The market did not react adversely to this news as it was in line

with other banks' charges.

65.     Then, on October 24, 2007, before the market opened, Merrill issued a press

release which announced the third quarter charge would be $8 billion instead of $5 billion. The

release, entitled "Merrill Lynch Reports Third-Quarter 2007 Net Loss From Continuing

Operations of $2.85 Per Diluted Share; Record Net Revenues From Global Private Client, Equity

Markets and Investment Banking for the First Nine Months of 2007," stated in part:

> Merrill Lynch today reported a net loss from continuing operations
> for the third quarter of $2.3 billion, or $2.85 per diluted share,
> significantly below net earnings of $2.22 per diluted share for the
> second quarter of 2007 and $3.14 for the third quarter of 2006.
> Third-quarter 2006 net earnings per diluted share, excluding the
> impact of the one-time, after-tax net benefit of $1.1 billion ($1.8
> billion pretax) related to the merger of Merrill Lynch Investment
> Managers (MLIM) and BlackRock (NYSE: BLK), were $1.97.
> Third-quarter 2007 results reflect significant net write-downs and
> losses attributable to Merrill Lynch's Fixed Income, Currencies &
> Commodities (FICC) business, including write-downs of $7.9
> billion across CDO's and U.S. subprime mortgages, which are
> significantly greater than the incremental $4.5 billion write-down
> Merrill Lynch disclosed at the time of its earnings prerelease.
> These write-downs and losses were partially offset by strong
> revenues in Global Wealth Management (GWM), Equity Markets
> and Investment Banking, particularly in regions outside of the U.S.
> The results described above and herein, exclude Merrill Lynch

Insurance Group (MLIG), which is reported under discontinued operations.

Third-quarter 2007 total net revenues of $577 million decreased 94 percent from $9.8 billion in the prior-year period and were down 94 percent from $9.7 billion in the second quarter of 2007. Merrill Lynch's third-quarter 2007 pretax net loss was $3.5 billion. At the end of the third quarter, book value per share was $39.75, down slightly from the end of the third quarter of 2006.

"Mortgage and leveraged finance-related write-downs in our FICC business depressed our financial performance for the quarter. In light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated," said Stan O'Neal, chairman and chief executive officer. "We expect market conditions for subprime mortgage-related assets to continue to be uncertain and we are working to resolve the remaining impact from our positions," Mr. O'Neal continued. "Away from the mortgage-related areas, we continue to believe that secular trends in the global economy are favorable and that our businesses can perform well, as they have all year."

Net revenues for the first nine months of 2007 were $20.0 billion, down 23 percent from $25.8 billion in the comparable 2006 period. Net earnings per diluted share of $1.94 were down 62 percent from $5.12 in the prior-year period, and net earnings of $2.0 billion were down 61 percent. Results for the first nine months of 2006 included $1.2 billion of one-time, after-tax compensation expenses ($1.8 billion pretax) related to the adoption of Statement of Financial Accounting Standards No. 123R ("one-time compensation expenses") incurred in the first quarter of 2006, as well as the net benefit associated with the MLIM merger. Excluding these one-time items, net revenues for the first nine months of 2007 were down 16 percent, net earnings per diluted share were down 63 percent and net earnings were down 62 percent from the prior-year period. The pretax profit margin for the first nine months was 12.8 percent, down 14.2 percentage points from the comparable 2006 period, or down 16.3 percentage points excluding the one-time items. The annualized return on average common equity was 6.5 percent, down 13.0 percentage points from

the first nine months of 2006, or down 13.4 percentage points
excluding the one-time items.

66.     On this news, Merrill's stock dropped from $67.12 per share to as low as $61.40

per share, closing at $63.22 per share on volume of 52 million shares.

67.     Subsequently, on October 25, 2007, S&P reduced Merrill's credit rating to

negative after the brokerage reported the biggest quarterly loss in its 93-year history, causing

Merrill's stock to dramatically drop to $60.90 per share. The stock only began to recover upon

speculation that Merrill's CEO might be replaced.  Even after the CEO, defendant O'Neal,

resigned from the Company, the stock continued to collapse further, trading in the $55.00 per

share range.

68.     The true facts, which were known by the defendants but concealed from the

investing public during the Class Period, were as follows:

(a)     The Company was more exposed to CDO's containing subprime debt than

it disclosed; and

(b)     The Company's Class Period statements were materially false due to their

failure to inform the market of the ticking time bomb in the Company's CDO portfolio due to the

deteriorating subprime mortgage market which caused Merrill's portfolio to be impaired.

69.     More news confirmed that top management of Merrill had been aware of the risk

but concealed it and continued to make investments in CDO's due to the lucrative fees involved.

70.     On October 25, 2007, *The Wall Street Journal* further reported:

After presiding over one of the biggest losses in Wall Street
history, Merrill Lynch & Co. Chief Executive Stanley O'Neal finds
himself with a weakened power base as he fends off charges that
he let the firm's exposure to risky mortgages get out of hand.

-28-

Merrill said yesterday it took a $8.4 billion hit in the third quarter from revaluing bonds backed by mortgages and other write-downs. That was far higher than the $5 billion hit Merrill estimated just two and a half weeks ago – a surprise that led the firm's stock price to fall 5.8% as its credit rating was downgraded.

Overall, Merrill recorded a $2.24 billion loss for the quarter, making it the only one of Wall Street's five biggest investment banks to end the period in the red. Ratings firm Standard & Poor's described the write-downs as "staggering" and blamed "management miscues."

\*     \*     \*

Mr. O'Neal pushed to expand Merrill's role in new kinds of bonds and other financial instruments, which helped propel profits in recent years before leading to trouble. Merrill's annual operating profit averaged $5.22 billion between 2003 and 2006, more than double the $2.11 billion average in the preceding five years.

The $8.4 billion hit leaves it clear that Mr. O'Neal and his team didn't always appreciate the risks they took to achieve the greater profits. The write-downs surpass a $6 billion loss suffered in 2005 by the hedge fund Amaranth LLC, which had stood as the largest single known Wall Street loss.

\*     \*     \*

On the conference call, Mr. O'Neal accepted a share of responsibility, saying, "I am accountable for the mistakes as I am accountable for the performance of the firm overall."

That didn't prevent a tough interrogation by analysts who wondered why Merrill's estimate of its losses a few weeks ago was so far off. When Mr. O'Neal and another Merrill executive noted that Merrill had volunteered more information about its exposure than its Wall Street peers, analyst Mike Mayo of Deutsche Bank AG retorted, "But your peers didn't take an $8 billion write-down."

Merrill's $2.24 billion overall loss for the quarter came to $2.82 a share, compared with a profit of $1.94 billion, or $2 a share, a year earlier, before a onetime gain from the transfer of Merrill's

money-management unit to BlackRock. It was Merrill's first
quarterly loss since 2001.

\*     \*     \*

Merrill said it had cut in half its exposure to one risky asset class –
collateralized debt obligations, which are securities backed by
pools of assets including mortgages. It said it now has $15.2 billion
in CDO's, down from $32.1 billion three months earlier.

Analysts pushed Merrill to say whether it had cut its exposure by
selling the CDO's or by buying hedges in an attempt to balance
future losses. Mr. O'Neal declined to give a breakdown.

Merrill has been Wall Street's leading underwriter of CDO's since
2004. In addition to its mortgage and CDO write-downs, Merrill
recorded an additional $463 million of losses, or $967 million
before deducting fees, from commitments to finance leveraged
buyouts and other corporate activities. The firm said it exercised
"aggressive and effective risk management" in limiting the
corporate loan losses.

\*     \*     \*

For much of the mortgage boom, Merrill was able to sell the bulk
of the CDO's it underwrote to investors all over the world. But
from late 2005 onwards, it became harder for the investment bank
to find buyers for the growing volume of mortgage CDO's it was
arranging. Many investors felt they had invested enough money in
this asset class, and financial guaranty companies, which wrote
credit insurance on many CDO's, were getting skittish about their
growing exposures to mortgage securities in a slowing housing
market.

For Merrill, the fees it earned from arranging deals were too
lucrative to give up. Its profits averaged 1.25% of the deal volumes
it did, or around $12.5 million for each $1 billion CDO. More than
70% of the securities issued by each CDO bore triple-A credit
ratings. Traditionally these top-rated securities were insured by a
financial guaranty company, which effectively bore the risk of
losses. But by mid 2006, few bond insurers were willing to write

protection on CDO's that were ultimately backed by subprime mortgages to people with poor credit histories.

According to people familiar with the matter, Merrill put large amounts of AAA-rated CDO's onto its own balance sheet, thinking they were low-risk assets because of their top credit ratings. Many of those assets dived in value this summer.

71.    As a result of defendants' false statements, Merrill's stock price traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 30% from their Class Period high.

72.    By misrepresenting Merrill's business, the defendants presented a misleading picture of the Company's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Merrill's business was not as healthy as represented, Merrill falsely overstated its net income, and falsely concealed the problems with its CDO portfolio.

73.    These omissions caused and maintained the artificial inflation in Merrill's stock price throughout the Class Period and until the truth about its future earnings was revealed to the market.

74.    Defendants' false and misleading statements had the intended effect and caused Merrill stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $95 per share.

75.    On October 24, 2007, before the market opened, defendants were forced to publicly disclose the extent of problems with the Company's CDO portfolio, causing its stock to drop to as low as $61.40 per share on October 24, 2007 – a one day decline of $5.72 per share. As a direct result of defendants' admissions and the public revelations regarding the truth about

Merrill's profitability and its actual business prospects going forward, Merrill' stock price dropped more than $5 per share in October 2007 and more than $30 per share from May 2007. This drop removed the  inflation from Merrill's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

76.    It was imprudent for the Plan and its Participants to invest in the Plan, which held shares of Company stock, because the stock was artificially inflated as a result of the Company's financial manipulations and gross understatement of exposure to subprime loan risks.  Plaintiff also alleges that Defendants breached their fiduciary duties by continuing to allow investment in Company stock when they knew or should have known that it was an imprudent investment and failed to disclose material information necessary for Participants to make informed decisions concerning the Plan's assets and investment in Company stock.

77.    During the Class Period, Merrill Lynch's exposure to subprime losses was vastly understated, and the Company's operations, net income, earnings per share and cash flows from operations were overstated through accounting irregularities, including improper accounting for certain transactions.

78.    These misstatements and overstatements caused Merrill Lynch stock to trade at artificially inflated values throughout the Class Period.  When the nature of the problems was publicly disclosed, Merrill Lynch stock lost more than 28% of its value, over the period from October 15 to November 7.

79.    As a result of the Plan's fiduciaries position at the Company and their access to Company information, the fiduciaries breached their duties by allowing the Plan's continued

investment in Merrill Lynch stock at a time when they knew or should have known that such investment was imprudent.

## IX.  Defendants Knew or Should Have Known That

## Merrill Lynch Stock Was Not a Prudent Investment for the Plan

80.     During the Class Period, defendants had or should have had firsthand knowledge of the above-described accounting irregularities by virtue of their positions at Merrill Lynch.

81.     Defendants failed to properly consider the practices described above when evaluating the prudence of Company stock as an investment option for the Plan.

82.     Defendant fiduciaries responsible for monitoring the investment of the Plan's assets failed to adequately review the performance of the Savings Committee as day-to-day administrators of the Savings Plan.

83.     Defendants had or should have had intimate knowledge of both the Company's improper accounting practices during the Class Period as well as the Plan's heavy investment in Company stock.  Despite this knowledge, and in breach of their fiduciary duties to monitor the fiduciaries' actions to ensure that they have all the information needed to best provide a prudent portfolio of investment alternatives for the Plan, the Company and the other fiduciaries remained silent.

84.     Defendants failed to conduct an appropriate investigation into whether the Company stock was a prudent investment for the Plan.  Additionally, Defendants failed to provide the Plan's Participants with material information regarding investment in Company stock, including Company accounting irregularities.

85.     An adequate investigation by the Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Company stock was imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made ameliorating investment decisions, such as altering the mix of the Company Fund away from Merrill Lynch stock in favor of cash.

86.     Defendants' various failures to act, investigate or properly inform the Plan's Participants was aggravated by the fact that a significant size of the Plan's assets was invested in Company stock, a portion of which was non-participant directed, meaning that the Plan's Participants were powerless to transfer out of or sell their holdings of Company stock – in some cases, Participants were powerless to have their retirement money invested in anything other than Company stock.

87.     Maintaining such a large concentrated investment in a single security effectively precluded the Plan's fiduciaries from liquidating the imprudent holding in a timely fashion without causing a further collapse in its price.  To prevent such a collapse, the imprudent concentrated holding of Company stock would have had to be sold over an extended period of time.  None of the risks associated with the Plan's high concentration of Company stock were disclosed to the Plan's Participants.

88.     Therefore, because Defendants knew or should have known that the Company was not a prudent investment option for the Plan during the Class Period, they had an affirmative fiduciary obligation under ERISA to protect the Plan and its Participants from significant and entirely predictable losses incurred as a result of the Plan's investment in Company stock.

89.    Defendants failed to protect the Plan and its Participants from obvious risk of significant losses as a result of the Plan's large Company stock holdings.  In fact, Defendants have continued to allow investment of the Plan's assets to remain in Company stock despite the above-described revelations of the Company's problems.

## X.  Merrill Lynch and the Other Fiduciaries Suffered from Conflicts of Interest

90.    Merrill Lynch, as the single largest asset issuer of the Plan, suffered from an obvious conflict of interest.  It had an interest in maintaining the highest possible value and demand for its stock while at the same time serving the interests of the Plan and its Participants to invest in only prudent assets.

91.    As officers of Merrill Lynch, the individual Defendants' compensation was tied largely to the Company's performance.  In addition to a base salary, executives were eligible for annual incentive awards, dependant upon the Company's reported performance.

92.    Because of the Company's incentives to keep its prospects and stock price high and the fact that the individual Defendants' compensation was so closely tied to the price of the Company's stock, Defendants had a very strong incentive to have the Plan continually investing, each month, in Company stock.

93.    Elimination of the Company stock as an investment option for the Plan would have: (i) potentially reduced demand for Company stock in the open market; and, (ii) sent a negative signal to stock analysts and large institutional investors concerning the true underlying value of the Company's stock, both of which would have negatively affected the price of the Company's stock, resulting in lower compensation for the Defendants.

94.     These conflicts of interest put the Defendants in the position of having to choose between their own interests as employer, executives and stockholders, and the interests of the Plan's Participants, which ERISA dictates they were obligated to prudently and loyally serve with an "eye single."

## XI.  Class Action Allegations

95.     Plaintiff bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure in their representative capacity on behalf of themselves and a class (the "Class") of all persons similarly situated, defined as follows:

> All persons who were participants in or beneficiaries of the Merrill Lynch & Co., Inc. 401K Savings & Investment Plan (the "SIP"), the Merrill Lynch & Co., Inc. Employee Stock Ownership Plan (the "ESOP"), and/or the Retirement Accumulation Plan (the "RAP") (collectively, the "Plan") at any time from January 18, 2007 to November 7, 2007 (the "Class Period").

96.     Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

a.     **Numerosity.** The Class consists of thousands of individuals and is so numerous that joinder of all members as individual plaintiffs is impracticable.

b.     **Commonality.** There are questions of law and fact common to the Class. Such common questions include, but are not limited to:

i.     Whether Defendants are fiduciaries;

ii.     Whether Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plan by failing to prudently manage the assets of the Plan by continuing to hold substantially all of the assets

of the Plan in shares of Company stock under circumstances in which Defendants could not have reasonably believed that such was in keeping with how a prudent trustee would operate;

iii.   Whether Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plan by causing the Plan to make and maintain investments in Company stock, when it was not prudent to do so;

iv.    Whether Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plan under ERISA by providing incomplete and inaccurate information to participants regarding Company stock;

v.     Whether Defendants breached their fiduciary obligations to the participants and beneficiaries of the Plan by failing to prudently monitor so that the Plan's and participant's interests were adequately protected and served;

vi.    Whether Defendants breached their fiduciary obligations to the participants and beneficiaries of to provide complete and accurate information concerning the Company's financial well-being and the risk of Company stock as a retirement investment;

vii.   Whether Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occurred by continuing to allow Company stock as an investment for the Plan

and by failing to engaged independent fiduciaries and/or advisors who could make independent judgments concerning the prudence of the Plan's investments;

viii.    Whether Defendants, by failing to comply with their specific fiduciary responsibilities under ERISA § 404(a), 29 U.S.C. § 1104(a)(1), enabled co-fiduciaries to commit violations of reasonable efforts to remedy the breaches; and,

ix.    Whether, as a result of fiduciary breaches engaged in by the Defendants, the Plan and its participants and beneficiaries suffered losses.

c.    **Typicality.** Plaintiff's claims are typical of the claims of the Class.

d.    **Adequacy.** Plaintiff is a participant in the Savings Plan and is authorized under ERISA to bring this action on behalf of the Plan and its Participants. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests that are antagonistic to or in conflict with the interests of the Class as a whole, and Plaintiff has engaged competent counsel experienced in class actions and complex litigation.

97.    This action is properly maintainable as a class action for the following independent reasons and under the following portions of Rule 23:

a.    Given ERISA's imposition of a uniform standard of conduct on ERISA fiduciaries, the prosecution of separate actions by individual members of the Class would create

the risk of inconsistent adjudications which would establish incompatible standards of conduct for the Defendants with respect to their obligations under the Plan. Fed. R. Civ. P. 23(b)(1)(A).

      b.    The prosecution of separate actions by members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests. Fed. R. Civ. P. 23(b)(1)(B).

      c.    The Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole. Fed. R. Civ. P. 23(b)(2).

      d.    Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

      98.    There are one or more putative or certified securities class action cases pending against the Company and certain other Defendants. The claims asserted herein are brought under ERISA and related principles of federal common law and are not being asserted by the plaintiffs in the securities class actions. Indeed, Plaintiff's claims herein cannot be pursued in the securities actions, as the shares of the Company stock in the Plan were not open market purchases. Accordingly, the named plaintiffs in those class actions do not adequately represent the Plaintiff, the Plan or the Class herein with respect to ERISA claims. Moreover, the named plaintiffs in the securities actions may be subject to defenses, stays of discovery, heightened pleading requirements, and limitations of liability under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 77z-1(b), and other statutes and rules that do not apply to the claims asserted

herein. Furthermore, the shareholder plaintiffs in the securities actions lack standing under ERISA § 502(a), 29 U.S.C. § 1132(a), to bring an action on behalf of the Participants of the Plan for allegations of fiduciary breaches.

## XII.  Breaches of Fiduciary Duty

### COUNT I

### Failure to Prudently Manage the Plan's Assets

### (Breaches of fiduciary duties in violation of ERISA §§ 404 and 405,

### 29 U.S.C. §§ 1104 and 1105, against all Defendants)

99.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

100.    At all relevant times, as alleged above, Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plan and the Plan's assets.

101.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  ERISA states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
> - (A)  for the exclusive purpose of
>   - (i)  providing benefits to participants and their beneficiaries; and
>   - (ii)  defraying reasonable expenses of administering the plan;
> - (B)  with the care, skill, prudence, and diligence under circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(C)     by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D)     in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

ERISA § 404(a), 29 U.S.C. § 1104(a).

102.     ERISA also imposes explicit co-fiduciary liability on plan fiduciaries. ERISA states, in relevant part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which gave rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

ERISA § 405, 29 U.S.C. 1105.

103.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of the plan or disposition of plan assets are responsible for ensuring that investment

options make available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Defendants were responsible for ensuring that all investments in Company stock in the Plan were prudent, are liable for losses incurred as a result of such investments if they were imprudent.

104.    A fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

105.    The Defendants breached their duties to prudently and loyally manage the Plan assets. During the Class Period Defendants knew or should have known that the Company stock was not a suitable and appropriate investment for the Plan in light of the Company's inappropriate accounting. Nonetheless, during the Class Period, these fiduciaries continued to offer the Company's stock as an investment option, instead of other investments. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan's Participants, from suffering losses as a result of the Plan's investment in Company stock.

106.    In addition, Defendants breached their co-fiduciary obligations by, among other failures, knowingly participating in, or knowingly undertaking to conceal the failure to prudently and loyally manage the Plan's assets in exercising their discretion with respect to offering Company stock as an investment option in the Plan, despite knowing that such failure was a

breach; enabling the Company and the Defendants to fail to prudently manage the Plan's assets in exercising direction with respect to the Plan's investments, and by having knowledge of the Company's and the Defendants' failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

107.    Defendants named in this Count were unjustly enriched by the fiduciary breaches described in this Count.

108.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, Plaintiff and the Plan's Participants, lost a significant portion of their retirement investment.

109.    Pursuant to ERISA § 502(a)(2) & (3), 29 U.S.C. 1132(a)(2) & (3), and ERISA § 409(a), 29 U.S.C. 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### (Breaches of fiduciary duties in violation of ERISA §§ 404 and 405,

### 29 U.S.C. §§ 1104 and 1105, against Merrill Lynch)

110.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

111.    At all relevant times, Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. 1002(21)(A), with respect to the Plan because:

a.    The Company, as a Named Fiduciary, with duties to oversee the Plan's Plan Administrator's activities with respect to administering the Plan, appointed and/or was

charged with appointing and monitoring Granchi, Bays, Gannon, Stilwell and the Savings Committee and its members (the "Monitored Fiduciaries"), and, when necessary, removing them;

112.    The duty to monitor entails both giving information to and reviewing the actions of the Monitored Fiduciaries. Merrill Lynch, as the monitoring fiduciary, must therefore:

        a.    Ensure that the Monitored Fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

        b.    Ensure that the Monitored Fiduciaries are provided with adequate financial resources to do their jobs;

        c.    Ensure that the Monitored Fiduciaries have adequate information to do their job of overseeing the Plan's investments, especially with respect to the largest single asset in the Plan: Company stock;

        d.    Ensure that the Monitored Fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and,

        e.    Ensure that the Monitored Fiduciaries report regularly to the monitoring fiduciaries.

113.    The monitoring fiduciary must then review, understand and approve the conduct of the hands-on fiduciaries.

114.    Merrill Lynch had specific monitoring duties, which included, but were not limited to, the following:

a.    It was responsible for appropriately monitoring the Savings Committee, as well as its other officers and employees who performed their fiduciary function for the Savings Plan in the course and scope of their employment;

b.    It was responsible for appropriately monitoring other fiduciaries of the Unit Plan which it appointed, as well as its other officers and employees who performed their fiduciary function for the Unit Plan in the course and scope of their employment;

c.    It was obligated to act with an appropriate prudence and reasonableness in overseeing the Monitored Fiduciaries' management of the Plan's assets; and,

d.    It was responsible for ensuring that the Monitored Fiduciaries prudently and loyally served the interests of participants, and otherwise satisfied their fiduciary obligations.

115.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.    In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

116.    Merrill Lynch breached its fiduciary monitoring duties by:

a.    Failing to adequately monitor the Monitored Fiduciaries investment of the Plan's assets, specifically the Plan's investment in Company stock, and maintain the assets in Company stock, as opposed to cash or a prudent retirement investment;

-45-

b.      Failing to disclose to the Monitored Fiduciaries information concerning the financial condition and accounting practices of the Company that it knew or should have known was material to loyal and prudent investment decisions concerning the Plan's acquisition and retention of Company stock, and with respect to the implementation of the terms of the Plan;

c.      Failing to remove fiduciaries whom it knew or should have known were either: (i) not qualified to loyally and prudently manage the Plan's assets; or (ii) suffered under conflicts of interest because their compensation was tied to the price of Company stock;

d.      Failing to adequately monitor the activities of the Savings Committee and to monitor the activities of the Savings Committee in monitoring its delegates;

e.      Failing to adequately monitor the activities of Granchi, Bays, Gannon and Stilwell in performing their duties ensuring that they disclosed to others complete and accurate information regarding the Company stock;

f.      Enabling the Monitored Fiduciaries to breach their duties particularly with respect to the investment of the Plan's assets in Company stock, and the disclosure of complete and accurate information regarding Company stock;

g.      Making no effort to remedy the fiduciary breaches of the Monitored Fiduciaries when it knew or should have had knowledge of said breaches.

117.    Merrill Lynch knew or should have known that the fiduciaries it was responsible for monitoring were imprudently allowing the Plan to continue offering the Company's shares as an investment for the Plan, and continuing to invest the assets of the Plan in Company stock, when it was no longer prudent to do so, yet failed to take action to protect the participants from the consequences of the Monitored Fiduciaries' failures.

-46-

118.    In addition, as a result of its inappropriate practices and implicit knowledge thereof, Merrill Lynch, in connection with their monitoring and oversight duties, was required to disclose to the Monitored Fiduciaries accurate information about the financial condition and practice of the Company that they knew or should have known that the Monitored Fiduciaries needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, Merrill Lynch breached its monitoring duties under the Plan and ERISA.

119.    Merrill Lynch is liable as a co-fiduciary because it knowingly participated in the fiduciary breaches by the Monitored Fiduciaries; by enabling the breaches by the Savings Committee, Granchi, Bays, Gannon and Stilwell; and by having knowledge of the Monitored Fiduciaries' breaches, yet not making effort to remedy the breaches.

120.    Merrill Lynch was unjustly enriched by the fiduciary breaches described in this Count.

121.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

122.    Pursuant to ERISA § 502(a)(2) & (3), 29 U.S.C. 1132(a)(2) & (3), and ERISA § 409(a), 29 U.S.C. 1109(a), Merrill Lynch is liable to restore the losses to the Plan caused by its breaches of fiduciary duties alleged in this Count.

## COUNT III

**(Breaches of fiduciary duties in violation of ERISA §§ 404 and 405,**

**29 U.S.C. §§ 1104 and 1105, against all Defendants)**

123.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

124.    At all relevant times, Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. 1002(21)(A), by exercising authority and control with respect to the management of the Plan and the Plan's assets.

125.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan.

126.    This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options available under the Plan. This duty applies to all of the Plan's investment options, including investments in Company stock.

127.    The duty to inform is particularly important where investment in plan assets such as the one here was not diversified and overwhelmingly invested in Company stock. Such investments carry with them an inherently high degree of risk. This inherent risk make these Defendants' duty to provide complete and accurate information especially important.

128.    The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Company stock, the Company's accounting

-48-

improprieties, and the consequent artificial inflation of the value of the stock and, generally, by conveying inaccurate information regarding the soundness of Company stock and the prudence of investing retirement contributions in the stock. This failure was particularly devastating to the Plan and its Participants since a substantial portion of the Plan's assets were invested in Company stock. Thus, losses in the Company's stock price had an enormous impact on Participants' retirement assets.

129.    Defendants are liable as co-fiduciaries because they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding Company stock, despite knowing of their breaches; by enabling such conduct as a result of their own failures to satisfy their fiduciary duties; and by having knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet not making any effort to remedy the breaches.

130.    These actions and failures to act were uniform and caused the participants and beneficiaries of the Plan to continue to make and to maintain substantial investments in Company stock in the Plan at a time when these Defendants knew or should have known that the participants and beneficiaries did not have complete and accurate information concerning in their investments. Plaintiff and the Class relied to their detriment on these Defendants' incomplete and inaccurate statements regarding Company stock.

131.    Defendants named in this Count were unjustly enriched by the fiduciary breaches described in this Count.

132.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

133.    Pursuant to ERISA § 502(a)(2) & (3), 29 U.S.C. 1132(a)(2) & (3), and ERISA § 409(a), 29 U.S.C. 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

### (Breaches of fiduciary duties in violation of ERISA §§ 404 and 405,

### 29 U.S.C. §§ 1104 and 1105, against all Defendants)

134.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

135.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty to loyalty – that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

136.    The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

137.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occurred by continuing to allow Company stock as an investment for the Plan during the Class Period, by failing to engage independent fiduciaries and/or advisors who

could make independent judgments concerning the Plan's investment in Company stock and the information provided to participants and beneficiaries concerning it. Defendants exacerbated this breach by generally failing to take any steps to ensure that the Plan's fiduciaries did not suffer from a conflict of interest.

138.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by:

a.    failing to engage independent fiduciaries and/or advisors who could make independent judgments concerning the Plan's investment in Company stock;

b.    failing to notify appropriate federal agencies, including the Department of Labor, of the facts and transactions which made the Company stock an unsuitable investment for the Plan;

c.    failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served;

d.    with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and,

e.    by otherwise placing the interests of the Company and themselves above the interests of the participants with respect to the Plan's investment in Company stock.

139.    Defendants were unjustly enriched by the fiduciary breaches described in this Count.

140.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

141.    Pursuant to ERISA § 502(a)(2) & (3), 29 U.S.C. 1132(a)(2) & (3), and ERISA § 409(a), 29 U.S.C. 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## SECTION 404(C) AFFIRMATIVE DEFENSE INAPPLICABLE

142.    ERISA §404(c), 29 U.S.C. §1104(c), provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions. None of the losses to the Plan resulted from Participants' exercise of control over their investment decisions. Instead, as has been detailed above, these losses resulted from Plan's fiduciary decisions that resulted in offering imprudent investment options and imprudent investment of Plan's assets in Merrill Lynch Stock. Hence, the §404(c) defense is inapplicable to these claims.

143.    Moreover, in order for the affirmative defense of §404(c) to apply, many conditions must be met. In particular, *all* of the over 20 requirements spelled out in the DOL regulations issued pursuant to §404(c) at 29 C.F.R. §2550.404c-1 *must* be satisfied. These include the requirements that the risks of investment options be adequately disclosed to plan participants, that participants' holdings in transactions in Merrill Lynch Stock be kept confidential, and that participants be informed that "the Plan is intended to constitute a plan described in §404(c) and the regulations, and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or beneficiaries," 29 C.F.R. §2550.404c-1(b)(2)(B)(*1*)(*i*).

144.    The affirmative defense of §404(c) is unavailable to Defendants because, among other reasons, the Plan did not comply with the various requirements of §404(c) and its

associated regulations. For instance, Participants were not adequately informed that the Plan were intended to be a §404(c) plan because the SPD failed to identify what portions of the Plan were intended to comply with §404(c). Nor were Participant's adequately informed of the risks of investing in the Merrill Lynch Stock, including the risk of investing in a non-diversified fund limited to a single stock or the risk associated therewith.

145. Moreover, as alleged above, Defendants failed to provide participants with complete and accurate information regarding Merrill Lynch Stock in the Plan and the financial condition of the Company. The DOL's §404(c) regulations note, significantly, that participants do not exercise control over their investment decisions sufficient to justify application of a §404(c) defense where a "plan fiduciary has concealed material non-public facts regarding the investment from the participant." Accordingly, participants failed to exercise the independent control over their investment in Merrill Lynch Stock in the Plan that is necessary for the §404(c) defense to apply.

146. In addition, §404(c) does not apply to any portion of the Plan deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to Plan that provide plan participants with a full range of investment options, which an ESOP by its very nature does not. 29 C.F.R. §2550.404c-1. Nor can §404(c) apply to any losses that result from the Company's Matching Contributions, as participants did not exercise control over those investments.

147. According to the Plan's Trust Agreement, where the Plan fail to at any time to qualify under §404(c), all participant-directed investments shall be deemed to have been directed by the Plan Administrator.

### XIII. Causation and Remedies

148.    The Plan suffered a loss, and the Plaintiffs and the other Class members were damaged, because substantial assets in the Plan were invested in the Company stock during the Class Period in violation of the Defendants' fiduciary duties.  As fiduciaries, the Defendants were responsible for the prudence of investments in the Plan during the Class Period unless participants in the Plan themselves exercised effective and informed control over the assets in the Plan in their individual accounts pursuant to ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.  Those provisions were not complied with here; instead of taking the necessary steps to ensure effective participant control by complete and accurate disclosure and regulatory compliance, the Defendants did exactly the opposite.  As a consequence, participants in the Plan did not control the Plan's assets that were invested in Company stock, and the Defendants remained entirely responsible for ensuring that such investments were and remained prudent.  The Defendants' liability to Plaintiffs for damages stemming from imprudent investments of the Plan's assets in Company stock is therefore established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

149.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties by divesting the Plan of some or all of its imprudent holdings of Company stock and investing the assets in other investments as the Plan administrators should have determined was in the best interest of the Plan's Participants, by appropriately monitoring the actions of the Plan's

fiduciaries, and by replacing breaching fiduciaries with prudent fiduciaries, some or all of the Plan's losses caused by Defendants' breaches of fiduciary duty would have been avoided.

150.    Plaintiffs further contend that the Plan suffered a loss, and Plaintiff and the other Class members were damaged, by Defendants' above-described conduct during the Class Period because of Defendants' materially inaccurate statements, acts and omissions in connection with the prudence of making and maintaining investments in Company stock.   Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant that results in harm to the participant, the participant is presumed, as a matter of law, to have relied upon such misrepresentations and omissions to his or her detriment. Here, Defendants' above described statements, acts and omissions constituted misrepresentations and omissions that further caused Plaintiffs' losses.

151.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

152.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable investment available.   In this way, the remedy restores

a.      restoration to the Plan for losses resulting from imprudent investment of the Plan's assets;

b.      restoration to the Plan of all profits the Defendants made through use of the Plan's assets;

c.      restoration to the Plan of all profits that the Plan would have made had the Defendants fulfilled their fiduciary obligations; and,

d.      other equitable restitution and appropriate equitable monetary relief.

D.      An Order imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

F.      An Order permanently removing the Defendants from any position of trust with respect to the Plan and the appointment of independent fiduciaries to administer the Plan;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the Common Fund Doctrine;

I.      An Order awarding such other and further relief as the Court deems equitable and just.

DATED:        November 13, 2007          Respectfully submitted,

SHALOV STONE BONNER & ROCCO LLP

By: _____

    Ralph M. Stone (rstone@lawssb.com)
    Thomas G. Ciarlone (tciarlone@lawssb.com)
    Amanda C. Scuder (ascuder@lawssb.com)

485 Seventh Avenue, Suite 1000
New York, NY 10018
Telephone: (212) 239-4340
Facsimile: (212) 239-4310

Ronen Sarraf (ronen@sarrafgentile.com)
SARRAF GENTILE LLP
11 Hanover Square
New York, NY 10005
Telephone: (212) 868-3610
Facsimile: (212) 918-7967

*Attorneys for Plaintiffs*

-58-